# IN THE COURT OF APPEALS OF IOWA

No. 13-1949
Filed October 29, 2014

**STATE OF IOWA,**
        Plaintiff-Appellee,

**vs.**

**ANDREW SCOTT YERHART,**
        Defendant-Appellant.
_____

        Appeal from the Iowa District Court for Lee (South) County, John G. Linn,

Judge.


        Andrew Scott Yerhart appeals from his conviction after jury trial of

attempted murder, going armed with intent, and harassment in the first degree.

**AFFIRMED.**


        Mark C. Smith, State Appellate Defender, and Rachel C. Regenold,

Assistant Appellate Defender, for appellant.

        Thomas J. Miller, Attorney General, Bridget A. Chambers, Assistant

Attorney General, Michael Short, County Attorney, and Bruce C. McDonald,

Assistant County Attorney, for appellee.


        Considered by Vaitheswaran, P.J., McDonald, J., and Goodhue, S.J.*

        *Senior judge assigned by order pursuant to Iowa Code section 602.9206 (2013).

**GOODHUE, S.J.**

Andrew Scott Yerhart appeals from his conviction after jury trial of attempted murder, going armed with intent, and harassment in the first degree.

## I. Background Facts and Proceedings

The State filed charges after an incident that occurred on August 10, 2013. The three charges levied were initially filed separately but were later consolidated. A supplemental trial information was filed charging Yerhart with attempted murder in count one, going armed with intent in count two, and harassment in the first degree in count three. A jury trial was held from October 22 to 25, 2013, and Yerhart was convicted of all three counts. On December 9, 2013, he was sentenced accordingly.

Yerhart and his victim, Michael Rupp, were rivals for the attention and affection of twenty-four year old Amanda Steele. Steele and Rupp had been engaged for two years, but broke up some time in 2011. Yerhart and Steele began a relationship around Christmas of 2012 and began living together after Valentine's Day of 2013. Steele became pregnant by Yerhart soon thereafter. The relationship between Yerhart and Steele deteriorated, and she moved out of Yerhart's house, and Rupp and Steele renewed their relationship.

Steele and Yerhart retained a relationship even after she moved out. Yerhart thought they were trying to get back together, but Steele stated her only interest was the future of the child. She testified she had not been interested in reunification, but her actions did not make that clear to Yerhart. Yerhart was angry with Rupp and sometime after July 8 told Steele he was going to find Rupp and shoot him. Yerhart told Steele to stay away from Rupp.

In the early evening of August 10, 2013, Rupp had been fishing in the Des Moines River and was returning to the Red Wing access when he observed Yerhart assisting another boat's occupants at the access. Yerhart began yelling at Rupp, "Stay away from her," "I'll kill you," and "I could have got you before." Yerhart challenged Rupp to come in off the water and finish it. Witnesses at the ramp also heard Yerhart threaten Rupp and heard him say Rupp was "a dead man" and that "he'd get a chance one of these days." Rupp called 911 for assistance so he could land his boat without a confrontation, but by the time police arrived Yerhart was gone.

Yerhart had left the Red Wing access in a truck with two other men. On the way home they stopped and talked to Yerhart's neighbor, Joe Cass. Yerhart told Cass that the fight was on and he was going to "kick someone's ass." When Cass asked who, Yerhart responded "down at Red Wing I seen Mike." Ten or fifteen minutes later Yerhart came back and pulled up on his four wheeler. Cass noted that Yerhart had a gun. Cass cautioned Yerhart not to get in trouble.

Rupp had docked his boat and started toward his home in his truck when he saw Yerhart coming toward him on his four wheeler. Yerhart turned around and pulled up alongside Rupp's truck and yelled at him that they needed to talk. Rupp continued toward his home, but in his rearview mirror he saw the four wheeler stop. He heard Yerhart curse him, saw a flash, and heard a bang. The back window of Rupp's truck was shattered. He sped towards home and soon felt the blood running down the back of his neck and shoulders. Steele arrived at Rupp's home soon after Rupp. A 911 call was being made when she arrived.

Law enforcement responded to the 911 call and observed Rupp being loaded in an ambulance. An officer observed Rupp's wound. There was a bullet hole in the back window of Rupp's pickup and the headrest on both the front and back driver's-side seat. A bullet fragment was found on the right driver's-side floor. Rupp underwent surgery to remove a bullet fragment and was hospitalized for three days.

Yerhart testified substantially as set out, insisted he only wanted to talk to Rupp, and denied that he intended to kill or injure him. He denied shooting at anything specific besides the truck. Yerhart testified, "I pulled out my pistol and told him to stop one more time, and he didn't. And I—I shot the truck. Just pointed it and pulled the trigger." Yerhart testified he was familiar with guns and had practiced shooting at targets. He further testified he had used the same .357 pistol that he used to shoot at the pickup to hunt deer.

Yerhart claims ineffective assistance of counsel because of his counsel's failure to make an objection to what he contends was inadmissible opinion evidence, inadmissible bad acts, and prosecutorial misconduct.

## II. Standard and Scope of Review

Claims of ineffective assistance of counsel raise constitutional issues and are therefore reviewed de novo. *State v. Brubaker*, 805 N.W.2d 164, 171 (Iowa 2011). Such claims are reserved for postconviction-relief proceedings when challenged actions implicate trial tactics or strategy. *State v. Rubino*, 602 N.W.2d 558, 563 (Iowa 1999). But such claims will be resolved on direct appeal if the record is adequate. *Id.*

### III. Error Preservation

Ineffective-assistance-of-counsel claims are an exception to the general rule of error preservation. *State v. Lucas*, 323 N.W.2d 228, 232 (Iowa 1982). Such claims need not be raised before the trial court. *Id.*

### IV. Discussion

**A.** Counsel's Failure to Object to Inadmissible Opinion Evidence

Yerhart's counsel's efforts were directed towards establishing that attempted murder and going armed with intent were overcharges. Further record is not required to ascertain defense counsel's strategy, as it was set out in both his opening and closing statement. Yerhart's counsel's strategy was to attack the specific intent element of the charges filed. On cross-examination, Yerhart's counsel brought out that the arresting officer, Deputy Stacy Weber, told Yerhart he was going to charge him with willful injury. In redirect, the officer stated he had in fact charged attempted murder, going armed with intent, and harassment in the first degree. On re-cross the following exchange took place between defense counsel and Weber:

> Q. Is it a fair statement that you thought attempted murder was the appropriate charge because of the severity of the injuries to Mr. Rupp? A. Yes, sir.
> Q. Not because of any action of Mr. Yerhart that you had learned at a later date? A. Well, when you shoot someone anywhere remotely close to their head, that's attempted murder to me.
> Q. But you knew that before you interviewed Mr. Yerhart, didn't you? A. I—I knew that he was shot in the neck, but I didn't— I didn't know how severe the wound was—
> Q. Yeah. A. –or the location.

Then in final argument counsel used this exchange to attack the specific intent element of the two charges. He stated,

And the other important thing is what did Mr. Weber tell you about this? He said that, originally he—he was going to charge Andrew with Willful Injury and then when he sees, basically, the severity of the wounds, that's when it becomes Attempted Murder, not because of, you know, anything in there about specific intent of Andrew, not because of Andrew's actions. And Stacy was specifically asked by me: Was it because of Andrew's actions that was changed? No, it wasn't, it was because of the severity of the wounds.

Counsel's efforts to convince the jury of a lesser charge were not effective, but a failed strategy or tactic does not constitute ineffective assistance of counsel. *See State v. Aldape*, 307 N.W.2d 32, 42 (Iowa 1981). Furthermore, Weber was being questioned as to the reason he selected a particular charge, and not his opinion as to Yerhart's guilt. The charge he wrote represented his conclusion based on his investigation of the incident. Furthermore, his conclusions and the facts upon which his conclusions were based were already in evidence. Evidence admitted which is cumulative of admissible evidence in the record is not prejudicial. *State v. Schaer*, 757 N.W.2d 630, 638 (Iowa 2008).

**B.** Counsel's Failure to Object to Inadmissible Bad Acts Evidence

Deputy Weber testified that he had been made aware that Yerhart had made threats through family members and there might be a shootout if officers tried to arrest him. The statement was made in his answer to a question relating the circumstances of Yerhart's being taken into custody. "Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that the person acted in conformity therewith." Iowa R. Evid. 5.404(b). Yerhart was arrested the same night of the shooting. The arrest was a part of the occurrence and was admissible to show the complete story of the crime. *See State v. Walters*, 426 N.W.2d 136, 140-141 (Iowa 1988).

**C.** Counsel Was Ineffective for Failing to Object to the Prosecutor's Misconduct in Attacking Yerhart's Credibility

1. Prosecutor's Misconduct in Examining Yerhart.

In cross-examination the following exchange took place between Yerhart and the prosecutor in discussing the shooting:

> Q. That's a coincidence? A. Yes.
> Q. Because you weren't aiming at the driver's side? A. I didn't aim at all.
> Q: And it's just a coincidence that that thing went right through the head rest on the driver's side and into Mike Rupp's neck? A. Yes, a horrible coincidence, yes.
> Q. Well it's either a horrible coincidence or you're not telling the truth. A. No, I'm telling the truth.

Yerhart's intent, an element in two of the charges levied, was again the focal point of the exchange between Yerhart and the prosecutor. In cross-examination the prosecutor simply pointed out the obvious. If Yerhart was not aiming his gun at the occupants of the moving pickup as Yerhart maintains, the fact that a bullet penetrated the pickup and struck Rupp must have been a coincidence. The logical conclusion was that it was either a terrible coincidence or Yerhart was not telling the truth. "A defendant in a criminal case who takes the stand submits himself to cross-examination the same as any other witness." *State v. Bauer*, 324 N.W.2d 320, 323 (Iowa 1982); *see also* Iowa R. Crim. P. 2.20(1). In some circumstances repeated cross-examination questions challenging the veracity of the defendant might add up to a finding of prejudice and raise an issue as to the fairness of the trial, but the single question on which Yerhart relies does not constitute prosecutorial misconduct. *See State v. Carey*, 709 N.W.2d 547, 556 (Iowa 2006).

2. Counsel's Misconduct In Argument

In final arguments the prosecutor made the following comments on Yerhart's rendition of his activities and intent when he went home after the confrontation at the Red Wing access and before the shooting.

> He gets dressed and he grabs a belt that he's said oh, just by coincidence, my gun—I keep a gun on that belt.
> Well now, ladies and gentlemen, if you believe that, you will certainly believe me when I tell you I have a pet alligator at home that plays the bass guitar. That's not a true statement by the defendant, folks. Use your common sense, reason. He goes home to get his gun and is going to go back and he's going to shoot Michael Rupp.

Shortly thereafter, in final argument the prosecutor again commented on Yerhart's truthfulness as to his true intentions,

> So how does his gun play into this? Well, he said he had heard that Michael Rupp carried a .45. Well, any other evidence in the record suggest that, folks? But the defendant's got to have some explanation for you as to why he's bringing his gun to this kicking-ass party, right?
> That wasn't true, either, because from the time he left Red Wing Access till the time he caught up again with Michael Rupp, his specific purpose was to shoot him to kill him.

The court must consider three factors in determining whether the prosecutor's statements constitute misconduct.

> (1) Could one legitimately infer from the evidence that the defendant lied? (2) Were the prosecutor's statements that the defendant lied conveyed to the jury as a prosecutor's personal opinion of the defendant's credibility, or was such other argument related to specific evidence that tended to show the defendant had been untruthful? and (3) Was the argument made in a professional manner, or did it unfairly disparage the defendant and tend to cause the jury to decide the case based on emotion rather than upon a dispassionate review of the evidence?

*State v. Graves*, 668 N.W.2d 860, 874-75 (Iowa 2003).

The issue the prosecutor was addressing was Yerhart's acquisition of his gun and the short time spent between the Red Wing access incident and the actual shooting. Yerhart had claimed all he wanted to do was fight Rupp and it was just a coincidence that the belt he retrieved had a gun attached. As to the first factor, a juror could easily infer from the evidence that Yerhart's assertion that his acquisition of the gun was a coincidence was not a true statement. The ultimate issue was Yerhart's intent, and intent can seldom be stablished by direct proof. *See State v. Schminkey*, 597 N.W.2d 785, 789 (Iowa 1999). The prosecutor's statement was related to circumstantial evidence that tended to show Yerhart had been untruthful. Yerhart had stated at the Red Wing access immediately prior to the shooting that he was going to kill Rupp and that Rupp was a dead man. As to the second factor, the prosecutor predicated Yerhart's intent on his own words and threats and the retrieval of the revolver. The prosecutor was expressing a conclusion based on the facts as they existed and not a baseless opinion of his own. When attempting to determine intent, words do have meaning. Particularly when they express a threat and are followed by the act threatened. As to the third factor, the prosecution went beyond the record in referring to his guitar-playing alligator. The comment, although trivial and hardly professional, is not such that it would have an impact on the jury's dispassionate view of the evidence. The prosecutor's statements were based on reasonable inferences from the record and were not a baseless expression of his personal belief. The prosecutor's argument reflects his attempt to tarnish Yerhart's credibility by reference to other facts and testimony of the case, which is a part of the prosecutor's duty. *See Carey*, 709 N.W.2d at 556.

### V. Conclusion

To prevail on a claim of ineffective assistance of counsel, a defendant must prove (1) counsel failed to perform an essential duty and (2) prejudice resulted. *State v. Maxwell*, 743 N.W.2d 185, 195 (Iowa 2008). Counsel's performance is measured objectively by determining what is reasonable on prevailing professional norms and the existing circumstances. *State v. Lyman*, 776 N.W.2d 865, 878 (Iowa 2010). Counsel has no obligation to raise a meritless claim or make a meritless objection. *State v. Brothern*, 832 N.W.2d 187, 192 (Iowa 2013). Yerhart is correct when he maintains that the cumulative effect of errors can satisfy the prejudicial prong of the claim of ineffective assistance of counsel. *See State v. Clay*, 824 N.W.2d 488, 500 (Iowa 2012). Nevertheless, we have not found that Yerhart's counsel has failed to perform an essential duty, nor do we find that he has suffered any prejudice even if counsel had failed to perform such a duty. The evidence of Yerhart's guilt was substantial, if not overwhelming.

**AFFIRMED.**